## A95A1795. ACHOR CENTER, INC. v. HOLMES.
### (465 SE2d 451)

BLACKBURN, Judge.

Kenneth R. Holmes, a minister, brought the underlying action for malicious prosecution and tortious interference with business relations against Achor Center, Inc. (Achor). Achor is a nonprofit organization that houses and trains homeless women and children. Achor and the church pastored by Holmes shared a facility. This arrangement led to a number of disputes between the two that culminated in Holmes' termination by his employer, the United Baptist Church (UBC), and Holmes' subsequent arrest for criminal trespass. This appeal stems from the trial court's denial of Achor's motion for summary judgment.

In 1987 the UBC sold property where it conducted religious services to the Christian Council of Metropolitan Atlanta, Inc. (CCMA). As a condition of the sale, UBC retained the right to use certain portions of the property. Subsequently, CCMA conveyed the property to Achor who established a homeless shelter on the site. Achor acknowledged the use agreement between CCMA and UBC, and UBC was permitted to continue conducting services at the facility. In 1988, UBC commenced a new Sunday service on the property, and Holmes was hired to serve as the minister.

Beginning in 1990, a series of confrontations took place between Holmes and various Achor officials. Among other things, Achor asserts that, contrary to its rules and despite requests that he refrain, Holmes repeatedly entered the women's dormitory without permission. The dormitory area was separate from the church where Holmes conducted services and Achor asserts that Holmes had no valid reason for being there. In January 1993, Achor's board of directors informed UBC of the dormitory problem and threatened to hold UBC legally liable for any "negative consequences" resulting from Holmes' presence at the facility. In February 1993, Achor's chairman wrote a letter to UBC requesting that Holmes be permanently precluded from entering Achor's property and renewed Achor's threat to hold UBC legally responsible for Holmes' acts. In April, Achor and UBC met specifically to discuss the removal of Holmes and his congregation from the Achor facility.

Shortly thereafter, on May 2, 1993, UBC discussed problems between Achor and Holmes at its quarterly meeting. Achor officials attended the meeting. At that time, UBC terminated Holmes' employment and withdrew funding for his ministry. Holmes did not consider his termination to be valid and continued to hold services on the Achor property even though Achor took certain measures to bar Holmes' entry. On one such occasion, when Holmes entered the facility to conduct services, UBC contacted the police. In response to questions posed by the arresting officer, Joyce Dorsey, Achor's chairman, provided documentary proof of Achor's ownership of the property and an oral account of the warnings issued to Holmes. Holmes subsequently filed these claims for tortious interference with business relations and malicious prosecution against Achor.

1. "The elements essential to a cause of action under OCGA § 51-7-40 are: (1) prosecution for a criminal offense; (2) instigated without probable cause; (3) with malice; (4) under a valid warrant, accusation or summons; (5) which has terminated favorably to the plaintiff; and (6) has caused damage to the plaintiff." *Wal-Mart Stores v. Blackford*, 264 Ga. 612, 613 (449 SE2d 293) (1994). Achor argues that it had probable cause to pursue criminal trespass claims against Holmes and that it was not acting maliciously.

"The gravamen of the complaint is the absence of probable cause on the part of the person instituting the prosecution. [Cits.] Probable cause is absent 'when the circumstances are such as to satisfy a reasonable (person) that the accuser had no ground for proceeding but his desire to injure the accused.'" Id. As a result, it is not necessary for Achor to prove that Holmes was guilty of criminal trespass but rather that Achor reasonably believed Holmes to be guilty of criminal trespass. See *Jones v. Parrish*, 203 Ga. App. 566, 569 (417 SE2d 210) (1992). Upon review of the undisputed evidence, we conclude that Achor could reasonably believe Holmes was guilty of the crime for which he was arrested.

Holmes was expelled from the UBC and removed from his pastorship several weeks before his arrest, and Achor was aware of his expulsion. A criminal trespass occurs when one knowingly or maliciously interferes with the possession or use of the property of another person without the owner's consent. OCGA § 16-7-21 (a). Despite the dissent's contention that Holmes was not adequately advised not to enter the Achor property prior to his arrest, Holmes admits that after his expulsion, he was not welcome at the Achor facility and Achor officials clearly communicated that to him. Holmes' deposition testimony reflects that, a few days prior to his arrest, Achor removed from its property the church sign that contained Holmes' name. Holmes confronted the individual removing the sign and their exchange grew so heated that the police were summoned.

By his own admission, Holmes perceived the sign's removal as an indication that he was without authority to enter Achor's property. Achor also changed the facility's locks to prevent Holmes' entry to the property, another act that Holmes considered part of a "continuing effort" to bar him from the property. Finally, as he stated in an affidavit given prior to his arrest, Holmes heard an Achor chairperson, Joyce Dorsey, openly and unequivocally state that Holmes was not to return to Achor's property.[1] In light of the above, when Holmes subsequently appeared on Achor property, Achor could reasonably believe that Holmes knowingly entered its property without consent and was thus guilty of criminal trespass.

Further, Achor has offered unrefuted evidence that it was UBC and not Achor who contacted the police complaining of Holmes' trespass. At the time of the arrest, an Achor official who was present at the request of UBC, merely responded to police questions. " 'The law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former case there is potential liability for false imprisonment or malicious prosecution [cit.]; in the latter case there is not. [Cit.]' " *Tench v. Turner*, 201 Ga. App. 156, 157 (410 SE2d 357) (1991). In the present matter, no evidence exists that Achor instigated the police investigation or urged the arrest of Holmes. Rather Achor's chairman "merely relayed facts about what [she] believed happened" to the investigating officer. Id. at 157.

Moreover, the trial court erred in considering certain evidence proffered by Holmes in support of his malicious prosecution claim. The evidence in question was an uncertified, photocopied portion of a hearing transcript taken in a different proceeding. This testimony extract is clearly an unauthenticated writing, OCGA §§ 24-7-1; 24-7-20, and is not properly considered in evaluating a summary judgment motion. *Gen. Ins. Co. of America v. Camden Constr. Co.*, 115 Ga. App. 189, 192 (154 SE2d 26) (1967) (evidence must be competent and admissible to raise a genuine issue of material fact on review of a summary judgment motion).[2]

---

[1] Holmes' own admission refutes the dissent's contention that Dorsey never informed Holmes that his entry to the property was forbidden.

[2] In responding to Achor's motion for summary judgment, Holmes offered numerous unauthenticated documents including correspondence, minutes from the UBC quarterly meeting when Holmes was terminated and additional testimony extracts. Many of these documents were simply attached to Holmes' brief and were not identified in any deposition transcript or affidavit. One such unauthenticated exhibit was a May 14, 1993 letter written to Holmes by UBC clearly stating that if Holmes entered Achor's facility after May 20, 1993 he would be trespassing.

Where undisputed facts disclose that a complaint was filed in good faith and with probable cause, summary judgment is appropriate. *Booker v. Eddins*, 183 Ga. App. 449, 450 (359 SE2d 211) (1987) rev'd on other grounds *Cincinnati Ins. Co. v. Perimeter Tractor &c. Repair*, 192 Ga. App. 243 (384 SE2d 449) (1989). In light of the foregoing, we find that the trial court erred in denying Achor's motion for summary judgment on the malicious prosecution claim. This holding is consistent with the policy to disfavor malicious prosecution actions and to encourage citizens to report an individual they suspect may have committed crimes. See *K-Mart Corp. v. Coker*, 261 Ga. 745, 747-748 (410 SE2d 425) (1991).

2. Achor also sought summary judgment on Holmes' claim that Achor tortiously interfered with the relationship between Holmes and UBC. Achor had a joint-use agreement with UBC that permitted UBC limited access to the property. Achor provided evidence of numerous instances of Holmes' erratic conduct that took place while he was present at the Achor facility or was witnessed by the Achor staff. This behavior led Achor to request UBC to restrict Holmes' access to the property.

"[A] person's business is property in the pursuit of which he is entitled to protection from *tortious* interference by a third person, *who, in interfering therewith, is not acting in the exercise of some right*." (Punctuation omitted.) *Taylor v. Greiner*, 156 Ga. App. 663, 666 (275 SE2d 737) (1980); see also *Life Care Ambulance v. Hosp. Auth. of Gwinnett County*, 202 Ga. App. 864, 868 (415 SE2d 502) (1992). As owner and operator of the property, Achor was attempting to exercise a legitimate interest, protecting the well-being of its residents and staff, when it sought to have UBC bar Holmes from the property. Further, Achor merely sought to protect its property rights in requesting that UBC preclude its agent, Holmes, from entering the property after it had previously complained of his conduct. It did not seek to interfere with the contract between UBC and Holmes. UBC's termination of Holmes was clearly its attempt to protect its interests and its contract with Achor.

On the facts of this case, Achor's dealings with UBC reflect no malicious intent toward Holmes, an element necessary to recover for tortious interference with business relations. See *Lake Tightsqueeze v. Chrysler First Financial Svcs. Corp.*, 210 Ga. App. 178, 181 (435 SE2d 486) (1993). Achor had an absolute right to protect its ownership rights in its dealings with UBC, and indeed had a duty to the females in the dormitory to take action. Therefore, the trial court erroneously denied Achor's motion for summary judgment as to the tortious interference claim and that ruling is reversed.

*Judgment reversed. Beasley, C. J., Birdsong, P. J., Pope, P. J., Andrews, Johnson, Smith and Ruffin, JJ., concur. McMurray, P. J.,*

*dissents.*

McMurray, Presiding Judge, dissenting.

I respectfully dissent as it is my view that the trial court correctly determined (as reflected in detailed findings of fact and conclusions of law) that genuine issues of material fact remain as to Reverend Kenneth R. Holmes' claims against Achor Center, Inc. ("Achor") for malicious prosecution and tortious interference with business relations. To this extent, I believe that the trial court properly construed the evidence in a light most favorable to the non-moving party's claims and therefore found that Achor, as the moving party, failed to carry its burden of piercing the basic allegations of Holmes' complaint. *McGinty v. Goldens' Foundry &c. Co.*, 208 Ga. App. 248 (1) (430 SE2d 185).

*Malicious Prosecution.* Two congregations were originally sanctioned by the United Baptist Church ("UBC") to conduct worship activities on the Stewart Avenue property, a congregation led by Reverend William Sperry (the Reverend Sperry's congregation) and a congregation led by Reverend Kenneth R. Holmes (the Reverend Holmes' congregation). This arrangement was achieved after Reverend Holmes and his family joined UBC's Stewart Avenue congregation in 1987, the Reverend Holmes' congregation meeting at noon on Sundays after completion of the Reverend Sperry's congregation's services. Although functioning separately, the two congregations financially supported UBC. Troubles began, however, after UBC sold its Stewart Avenue property to Achor.

At the outset, Achor accused Reverend Holmes of improprieties with its clients, charges which resulted in a temporary restraining order against the Reverend Holmes. It appears, however, that after the temporary restraining order was not converted to a permanent injunction, Joyce Dorsey, Achor's Chairperson of the Board of Directors, renewed charges that Reverend Holmes was breaching Achor's dormitory rules and contemporaneously threatened UBC with criminal and civil responsibility for any improprieties accomplished by Reverend Holmes. Under pressure, UBC resolved (upon a vote which purposely excluded members of the Reverend Holmes' congregation) to terminate Reverend Holmes, his family and (effectively) the Reverend Holmes' congregation from further fellowship. Notwithstanding, Reverend Holmes continued his religious ministries on the Stewart Avenue property without pay, prompting UBC's contact with law enforcement authorities on June 13, 1993. When the investigating police officer arrived on the scene, however, he did not immediately arrest Reverend Holmes. The officer first asked Chairperson Dorsey (the property-owners' representative) whether Reverend Holmes had been previously warned against trespassing, a necessary element to support

probable cause for the arrest of Reverend Holmes for criminal trespass. See OCGA § 16-7-21 (b) (2) and (3). Although there is proof that Chairperson Dorsey did not then have knowledge of any such warning from UBC, she advised the investigating officer that Reverend Holmes had been so warned. And based on this allegation, the officer arrested Reverend Holmes and took him to jail.

Unlike the majority opinion, the trial court's order recognizes that the criminal trespass charge against Reverend Holmes was dismissed for lack of probable cause. And unlike the majority's perspective of the evidence, the trial court recognizes that a jury may conclude that Chairperson Dorsey's conclusory accusation to the investigating officer (i.e., that Reverend Holmes had been previously warned not to enter the Stewart Avenue property) was sufficient to raise genuine issues of material fact regarding Achor's involvement in the arrest and its reckless or malicious intent in pressing charges against Reverend Holmes. I agree with this assessment, and further add that evidence of Chairperson Dorsey's long-standing feud with Reverend Holmes would buttress a jury's finding that animosity was a basis for her reckless or deliberate disregard to discover the truth of the report which resulted in the immediate jailing of Reverend Holmes. The trial court should be affirmed.

*Tortious Interference with Business Relations.* The majority justifies Achor's interference with the relationship between Reverend Holmes and UBC by inferring that Reverend Holmes was a danger to (among others) "the females in the dormitory. . . ." To this extent, the majority states that "Achor was attempting to exercise a legitimate interest, protecting the well-being of its residents and staff, when it sought to have UBC bar Holmes from the property." However, in apparent recognition of conflicting (and seemingly weak) proof in support of assertions that Reverend Holmes is a dangerous man, the trial court found that Achor did not (as a matter of law) have authority, in contract or in law, to interfere with Reverend Holmes' relationship with UBC by seeking his exclusion from the Stewart Avenue property. Specifically, the trial court recognized the covenant which allowed UBC representatives, such as Reverend Holmes, to be on the Stewart Avenue property and acknowledged that this proof, along with evidence of Achor's tactics to have Reverend Holmes completely removed from the Stewart Avenue property, rather than just its dormitory areas, raised genuine issues of material fact regarding Reverend Holmes' claim of tortious interference with business relations. Again, I agree with the trial court's assessment. And again I add that evidence of Chairperson Dorsey's emotionally charged threats to hold UBC criminally and civilly responsible for the consequences of Reverend Holmes' activities (inferring without conclusive proof that he constitutes a danger to others) would authorize a

jury's finding that Chairperson Dorsey was motivated by malice when she pressed UBC to terminate Reverend Holmes' ministry at the Stewart Avenue property.

Under the circumstances of the case sub judice, and in light of proof that would authorize a finding that Achor personnel had animosity and unjustifiable mistrust for Reverend Holmes before and after his discharge from UBC's fellowship, I cannot say (as a matter of law) that questions of Achor's malice, probable cause and intent (to the extent that these issues are relevant to Holmes' claims against Achor for tortious interference with business relations) are not for the jury. Indeed, a jury may well conclude that Chairperson Dorsey's aggressive efforts to remove Reverend Holmes from UBC's Stewart Avenue pulpit and have him banished from church property was nothing more than her unfavorable perspective of Reverend Holmes' intent when he was near certain women who were lodged in Achor's dormitory, an area which is apparently part of the church's worship center. Consequently, in the absence of conclusive proof that Reverend Holmes acted or intended to act unlawfully, indecently or immorally while on Achor's Stewart Avenue property, I would affirm the trial court's ruling on summary judgment with regard to Reverend Holmes' claim of tortious interference with business relations.

DECIDED OCTOBER 30, 1995 —
RECONSIDERATION DENIED DECEMBER 6, 1995 —

*Long, Weinberg, Ansley & Wheeler, Joseph W. Watkins, Debra E. Levorse, Griffith J. Winthrop III, Thompson, O'Brien, Kemp & Nasuti, J. Patrick O'Brien*, for appellant.

*Ronald J. Freeman, Jerome J. Stenger*, for appellee.